This appeal involves a challenge to a judgment entered against Masterbrand Cabinets, Inc., and in favor of Drucilla Johnson, awarding workers' compensation benefits to Johnson for a permanent and total disability based on debilitating pain and swelling of her hands and forearms. The parties stipulated at trial that the only issue to be determined was the extent of Johnson's disability. The trial court heard *Page 1138 
oral testimony from Johnson, from vocational experts for both parties, and from others, and it admitted into evidence records from Johnson's medical providers. After the trial, the parties deposed Dr. Sharon Colgin, a hand surgeon who treated Johnson for several months, and the trial court thereafter admitted into evidence a transcript of that deposition. On December 1, 2003, the trial court entered a judgment that awarded Johnson workers' compensation benefits for a permanent and total disability. Masterbrand filed a timely appeal.
Masterbrand manufactures kitchen and bathroom cabinets. Johnson was hired by Masterbrand in February 2000 to inspect and repair cabinet doors during the finishing process. The job required light sanding, puttying cracks, and flipping cabinet doors, and it involved repetitive motions of the hands, arms, and wrists all day long. Johnson handled 380-500 doors each day; each door weighed two to four pounds.
After several months of employment, Johnson began to feel pain in her wrists, hands, and arms. Johnson was eventually diagnosed with bilateral carpal tunnel syndrome and underwent surgery on both hands in January and February 2001. She subsequently returned to work on modified, mostly light, duty.
Johnson's hands and forearms continued to swell and ache as a result of repetitive motions at work. Johnson consulted with several doctors and eventually began receiving physical therapy and was prescribed muscle relaxants. She continued to work on light duty, but she was occasionally forced to miss work because of her pain. In February 2002, Dr. Colgin diagnosed Johnson's condition as pronator syndrome, [1] most likely due to the repeated pronation and supination of her forearms (i.e., palms up/palms down motions) when flipping doors. Dr. Colgin ruled out a recurrence of Johnson's carpal tunnel syndrome.
Because Johnson's condition did not improve significantly, even with continued physical therapy and work restrictions, Dr. Colgin suggested pronator release surgery, which she described as a major surgery, but one that is not life- or limb-threatening. Johnson declined to have the surgery because Dr. Colgin could not guarantee success and because her previous carpal tunnel surgeries did not help her condition much. The trial court expressly found that "Dr. Sharon Colgin opined that surgery was possible but there was a strong possibility that said surgery would not be successful [and] therefore [Johnson] quite reasonably did not elect to have said surgery."
Dr. Colgin testified in her deposition that in March 2002 she ordered a functional capacity evaluation ("FCE") for Johnson and "put" Johnson at MMI. In April 2002, David Bledsoe, a vocational expert, performed the prescribed FCE, which indicated that Johnson could perform medium-duty work, with significant restrictions on the use of her hands. Dr. Colgin reviewed the FCE and returned Johnson to work under Bledsoe's limitations, but only in a job that did not require repetitive motions of her hands and arms.
After Johnson returned to work, she remained symptomatic. She saw Dr. Colgin again in May 2002. Because conservative therapies had not been successful, Dr. Colgin advised Johnson that surgery or a different type of work were her only options. Dr. Colgin also told Johnson that she could no longer work at Masterbrand because it did not appear that Masterbrand *Page 1139 
had any jobs that did not involve repetitive arm motions. Johnson ceased working at Masterbrand in May 2002 and has not been gainfully employed since that time.
Johnson's last visit to Dr. Colgin was in July 2002. Her condition had at that time stabilized. After July 2002, however, Johnson's condition deteriorated significantly. At the time of the trial in August 2003, Johnson was complaining of swelling and constant, throbbing pain in her hands and arms that often reached a level of 8 on a scale of 10, with 10 being the worst.
Johnson testified that she did not think that there was any job in the world that she could perform because of the pain and swelling in her hands and arms. According to Johnson's testimony, she cannot sweep, cook, work in the yard, screw in a light bulb, or do many other normal household chores. She cannot crawl, climb a ladder, or stoop and push herself back up with her hands. She can pick up a gallon of milk only by using both hands. Johnson can drive for short distances, but she does so only if she cannot find someone else to drive.
Johnson takes medication to relieve the pain and inflammation. She takes an antidepressant to help her sleep. She also uses a TENS (transcutaneous electrical nerve stimulation) machine two or three times a day to relieve the pain. The TENS unit sends electrical impulses through her arms. This relieves the pain while it is on, but the effect does not last.
Johnson was 44 years old at the time of trial. She completed the 11th grade and has a G.E.D. She attended junior college for two semesters and completed training to become a certified nursing assistant. Her employment has mostly been in jobs requiring at least moderate physical activity and repetitive use of her hands and arms.
Dr. William A. Crunk, Johnson's vocational expert, testified that Johnson was 100% vocationally disabled because of her pain and inability to use her hands. Bledsoe, who performed the FCE, gave Johnson physical-impairment ratings of 6% to the whole body and 10% to the upper extremities. Jack Russell Gurley, Masterbrand's vocational expert, estimated Johnson's vocational disability to be between 35% and 45%.
As noted, the parties stipulated at trial that the only issue to be tried was the extent of Johnson's disability. Following the trial, at which the court received both documentary and ore tenus evidence, the court entered a detailed written judgment. The court found Johnson to be totally and permanently disabled. Included in its judgment were the following specific findings:
 "8. That [Johnson] was evaluated by Dr. William A. Crunk, Jr., Ph.D., vocational expert, and he testified, that in his opinion, the Functional Capacity Evaluation prepared by David Bledsoe was not valid and that [Johnson] could not in fact use her hands at a medium work capacity and that said Functional Capacity Evaluation was inconsistent with that level of work and that David Bledsoe's conclusion of medium work should not be considered a valid indicator of Drucilla Johnson's true ability. Dr. William A, Crunk, Jr. further testified that Drucilla Johnson's activities of daily living reflect a limited ability and she uses a Tens Unit two (2) to three (3) times a day for approximately 40 minutes and that her hands cramp up after about 20 minutes of use and she has to stop driving and that she can only do light activities on an intermittent basis and the Court finds, based on the review of all of the testimony in this case, that this is a correct assessment and the Court further *Page 1140 
agrees with Dr. Crunk's conclusion that Drucilla Johnson suffers a 100% vocational disability and loss of earning capacity;
 "9. That the Court further finds that [Johnson] experiences constant pain at such a high level, i.e., eight (8) to 10 on a scale of zero (0) to 10 and that this pain precludes reasonable, gainful employment;
 ". . . .
 "11. That the Court finds that the injuries to [Johnson's] upper extremities, and the resulting pain and disability therefrom, extends to other parts of her body and interferes with their efficiency in accordance with the tests adopted in the case of Ex parte Drummond Co., 837 So.2d 831
[(Ala. 2002)].
 "12. That upon the proof in this case, and the Court's observation of [Johnson], and the Court's finding that [Johnson's] testimony is completely credible in nature, [Johnson] is permanently and totally unable to perform [Johnson's] trade and is permanently and totally unable to obtain any type reasonable gainful employment, and the Court finds that [Johnson] suffers a 100% permanent and total disability to the body as a whole with a consequent 100% loss of earning capacity."
(Emphasis added.)
Masterbrand contends in this appeal that the trial court erred in awarding permanent-disability benefits to Johnson because Johnson was not at MMI at the time of the trial; that the trial court erred in not treating Johnson's injury as one to a scheduled member; and that in various respects there was not substantial, competent evidence to support the trial court's judgment.
The standard of review in a workers' compensation case is as follows:
 "In a workers' compensation case, `[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.' § 25-5-81
(e)(2), Ala. Code 1975; Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala. 1996) (holding that a trial court's finding of fact will not be reversed if that finding is supported by substantial evidence, i.e., if that finding is supported by evidence of `"such weight and quality that fairminded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved"' (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989))). Our review of legal issues shall be without a presumption of correctness; § 25-5-81(e)(1) provides that `in reviewing the standard of proof set forth herein and other legal issues, review . . . shall be without a presumption of correctness.'"
International Paper Co. v. Melton, 866 So.2d 1158,1162 (Ala.Civ.App. 2003). When evidence is received ore tenus, it is the duty of the trial court, which had the opportunity to observe the witnesses and their demeanor, and not the appellate court, to make credibility determinations and to weigh the evidence presented. Blackman v. Gray Rider Truck Lines,Inc., 716 So.2d 698, 700 (Ala.Civ.App. 1998). The role of the appellate court is not to reweigh the evidence, but to affirm the judgment of the trial court if its findings are reasonably supported by the evidence and the correct legal conclusions are drawn therefrom. Ex parte Trinity Indus.,Inc., 680 So.2d 262, 268-69 (Ala. 1996); Fryfogle v.Springhill Mem'l Hosp., Inc., 742 So.2d 1255
(Ala.Civ.App. 1998), aff'd, 742 So.2d 1258 (Ala. 1999). The "appellate court must view the facts in the light most favorable to the findings of the trial court." Ex parte ProfessionalBus. *Page 1141 Owners Ass'n Workers' Comp. Fund, 867 So.2d 1099, 1102
(Ala. 2003).
Masterbrand first contends that the trial court erred in awarding permanent-total-disability benefits to Johnson because Johnson was not at MMI at the time of the trial. Masterbrand argues that Johnson's condition deteriorated between March 2002, when Dr. Colgin placed Johnson at MMI, and the date of the trial. Based on Dr. Colgin's testimony at her posttrial deposition in September 2003, Masterbrand argues that Johnson's condition could be improved with additional physical therapy, as well as by pronator release surgery. Thus, Masterbrand argues that it was premature to award permanent-disability benefits to Johnson.
It is well settled that a trial court cannot award permanent-partial- or permanent-total-disability benefits until the worker has reached MMI. Ex parte Phenix RentalCtr., 873 So.2d 226 (Ala. 2003). A claimant has reached MMI when
 "`there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability.' G.UB.MK. Constructors v. Traffanstedt, 726 So.2d 704, 709 (Ala.Civ.App. 1998). `[M]aximum medical improvement is reached when the employee has recovered as much as medically possible from the wound such that the extent of permanent disability, if any, can be estimated.' 1 Terry A. Moore, Alabama' Workers' Compensation § 13:5, p. 502 (1998) (footnotes omitted). `Maximum medical improvement does not mean complete cure or total recovery from the work-related injury.' Id. `Permanent disability refers to the compensable disability remaining after
the employee has reached maximum medical improvement.' Id. at § 13:5, p. 514 (emphasis added; footnote omitted)."
Ex parte Phenix Rental Ctr., 873 So.2d at 229.
In this case, Dr. Colgin placed Johnson at MMI and then, more than a year later, gave posttrial deposition testimony that, Masterbrand argues, required the trial court to find that Johnson had not reached MMI in March 2002. We disagree. Dr. Colgin's posttrial deposition testimony was equivocal and was based on hypothetical questions and not on a reexamination of Johnson. Dr. Colgin testified, based on a hypothetical question, that Johnson was no longer at MMI "if additional therapy and/or surgery could offer some relief." Dr. Colgin also testified that additional therapies would be used "just to get her overall physical condition better, range of motion better, just overall health, and then see if that helped, and then possibly surgery." Significantly, Dr. Colgin did not opine that the suggested therapy was likely to improve Johnson's condition enough to permit her to return to work.
The trial court implicitly found that Johnson had reached MMI in May 2002. There is substantial evidence to support that finding. The critical inquiry is whether further treatment "could be reasonably anticipated to lessen the claimant's disability," G.UB.MK. Constructors, 726 So.2d at 709, and the trial court's written findings expressly answered that inquiry in the negative. Compare, e.g., Carquest AutoParts Tools of Montgomery, Alabama, Inc. v. Waite,892 So.2d 422 (Ala.Civ.App. 2004) (affirming determination of 100% permanent and total disability despite testimony that claimant might be able to work if she recuperates and is capable of returning to work after a third surgery); MasterbrandCabinets, Inc. v. Ruggs, 891 So.2d 869 (Ala.Civ.App. 2004), overruled on other grounds, Stone Webster Constr.,Inc. v. Lanier, 914 So.2d 869 (Ala.Civ.App. 2005), (finding that MMI had been reached *Page 1142 
is not precluded by possibility that employee could return to work if her pain could be reduced). See also 1 Terry A. Moore, Alabama's Workers' Compensation § 13:6, p. 503 (1998) (MMI is not precluded by the possibility of palliative care).
As noted, Masterbrand also takes issue with the sufficiency or competency of the evidence upon which the trial court based its judgment. Among other things, Masterbrand takes issue with the trial court's judgment to the extent it depends upon the testimony of Johnson, herself, as to the constancy and severity of the pain she experiences. Masterbrand cites no authority, however, for the proposition that a worker's testimony cannot provide substantial, competent evidence of incapacitating pain. Our law is to the contrary. See Jim, Walter Res., Inc. v.Budnick, 619 So.2d 926, 927 (Ala.Civ.App. 1993).
As noted at the outset, this court is obligated to affirm the judgment of a trial court as against a challenge to the sufficiency of the evidence supporting that judgment where the trial court's findings are supported by substantial evidence. Further, as noted, this court does not reweigh the evidence that was presented to the trial court, but must view the evidence in the light most favorable to the findings of the trial court. As to the substantive standard to be applied, we note that total disability does not mean absolute helplessness, but means the inability to perform one's trade or to otherwise obtain gainful employment. Genpak Corp. v. Gibson,534 So.2d 312 (Ala.Civ.App. 1988).
Based on the foregoing standards, and after a careful review of the conflicting evidence in the record before us, we must conclude that the trial court's judgment is supported by substantial evidence. Accordingly, we are unable to act upon Masterbrand's complaints about the sufficiency of the evidence in this case without acting outside of our scope of review as an appellate court.
Finally, we turn to Masterbrand's contention that the trial court erred in treating Johnson's injury as an unscheduled injury to the body as a whole, rather than as a scheduled injury to her arms under § 25-5-57(a)(3), Ala. Code 1975. Section 25-5-57(a)(3)a.24., Ala. Code 1975, prescribes the compensation to be awarded for the "loss of two arms, other than at the shoulder." Section 25-5-57(a)(3)d., Ala. Code 1975, provides that the permanent and total los of use of a member shall be considered as equivalent to the loss of that member.
In Ex parte Drummond Co., 837 So.2d 831 (Ala. 2002), the trial court awarded compensation outside the scheduled amount prescribed in §§ 25-5-57(a)(3)a.16. and 25-5-57(a)(3)d., Ala. Code 1975, for the loss of use of a leg. The Supreme Court held that such an award was inappropriate in that particular case, explaining, among other things:
 "In Bell v. Driskill, 282 Ala. 640, 213 So.2d 806 (1968), this Court established an exception that removes certain injuries from the workers' compensation schedule. This Court held in Bell:
 "`[A]lthough the injury itself is to only one part or member of the body, if the effect of such injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the [Workers'] Compensation Law to the amount allowed under the schedule for injury to the one member.' *Page 1143 
"282 Ala. at 646, 213 So.2d at 811. See also E.C Corp. v. Kent, 618 So.2d 1357, 1358
(Ala.Civ.App. 1992); A.M.R. Servs. v. Butler, 697 So.2d 472, 474 (Ala.Civ.App. 1997); Wolfe v. Dunlop Tire Corp., 660 So.2d 1345, 1348
(Ala.Civ.App. 1995).
 ". . . .
 "In Bell, this Court cited as authority for its analysis 2 Arthur Larson, Workmen's Compensation Law § 58.20, pp. 44-45:
 "`"The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive. A common example of this kind of decision is that in which an amputation of a leg causes pain shooting into the rest of the body, general debility, stiffening of the hip socket, or other extended effects resulting in greater interference with ability to work than would be expected from a simple and uncomplicated loss of the leg."'
 "Bell, 282 Ala. at 645, 213 So.2d at 810-11. Although it appears that the language used by this Court in Bell in stating the test was actually from a note in the American Law Reports,[4] it was the intention of this Court in adopting in Bell the exception to the workers' compensation schedule to address those instances where the injury to a scheduled member caused such impairment to the body as a whole that the benefits reflected on the schedule were not appropriate. . . .
 "_____
The Ex parte Drummond Court followed the foregoing with the explanation that "the Bell test permitted an injury to a scheduled member to be compensated outside the schedule if the effect of the injury extends to other parts of the body and produces a greater or more prolonged incapacity than that which naturally results from the injury to the specific member." 837 So.2d at 834. After listing cases decided by the Court of Civil Appeals that allowed nonscheduled compensation for scheduled members under circumstances other than those described by the Bell test, the Supreme Court next stated:
 "We renew our commitment to the policy that underlay the Bell test and that is recognized in the current edition of 4 Lex K. Larson, Larson's Workers' Compensation Law § 87.02 (2001):
 "`The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'
 "(Footnote omitted.) This language remains unchanged from the edition of the Larson treatise on which this Court relied in Bell. Because of the confusion *Page 1144 
that has developed surrounding the Bell
test, we today adopt the language recited above from Larson, Workers' Compensation Law
§ 87.02, as the test for determining whether an injury to a scheduled member should be treated as unscheduled; therefore, we overrule Bell
insofar as it established a different test. . . ."
837 So.2d at 834-35 (footnote omitted).
We do not read Ex parte Drummond as foreclosing compensation outside the schedule when an injury, although to a scheduled member, entails "an abnormal and unusual incapacity with respect to the member" — in particular, a debilitating pain — that impairs the body as a whole in a manner not contemplated by the schedule. The Supreme Court specifically explained in Ex parte Drummond that its original intention in adopting in Bell an exception to the workers' compensation schedule had been to "address those instances where the injury to a scheduled member caused such impairment to the body as a whole that the benefits reflected on the schedule were not appropriate." Ex parte Drummond,837 So.2d at 834. The Court thereafter "renew[ed] [its] commitment to the policy that underlay the Bell test."Id. at 834.
Although it then restated the applicable test as whether "`the effects of the loss of the member extend to other parts of the body and interfere with their efficiency,'" theDrummond Court did not have before it a case that required it to address an abnormal or unusual pain that, although isolated to a scheduled member, caused a more general, debilitating effect on the body as a whole. The ongoing pain experienced by the worker in Ex parte Drummond was not unusually severe; nor was it constant. Furthermore, it was pain that largely was precipitated by the worker's use, or overuse, of the scheduled member. In such a case, the worker, by refraining from the use of that member, may largely avoid the pain in question with the result being that the worker is in no worse a position due to his inability to use the affected member than if the member had been completely lost.[2]
Finally, as the Ex parte Drummond Court, itself, explained:
 "This case does not present a situation in which the pain, although isolated to a scheduled member, causes a disability to the body as a whole. We recognize that pain can be totally, or virtually totally, debilitating, but this case does not present such a situation; therefore, we decline to address that situation here."
Ex parte Drummond, 837 So.2d at 836-37 n. 11.
Clearly, pain isolated to a scheduled member might be sufficiently constant and severe, even when the worker refrains from using the scheduled member, that it would cause a debilitating effect to the body as a whole that is greater than the disability resulting from the loss of, or the loss of use of, that scheduled member as contemplated by § 25-5-57(a)(3). The Legislature undoubtedly assumed that there could be ongoing pain associated with the loss of or a permanent injury to a scheduled member. The question becomes whether the pain associated with a lost member, or with a permanently injured member even when the worker avoids the use of that member to the extent he or she *Page 1145 
reasonably can do so, either extends to other parts of the body and interferes with their efficiency or is sufficiently abnormal in its frequency or continuity and in its severity that it has a debilitating effect on the body as a whole.[3] We believe this understanding of the Legislature's intent in enacting § 25-5-57(a)(3) is consistent with our Supreme Court's holding inEx parte Drummond, as well as with the repeated admonitions by our Supreme Court that the Workers' Compensation Act is intended to serve a beneficent purpose and should be construed so as to effect that purpose. See, e.g., Ex parteStrickland, 553 So.2d 593, 595 (1989).
In Masterbrand Cabinets, Inc. v. Ruggs, 891 So.2d 869, this court affirmed a trial court's judgment finding a worker to be totally disabled in a case in which the workplace injury was to a scheduled member, the worker's left arm (specifically, her left hand and wrist). This court affirmed the award of benefits outside the schedule because the injury to the worker's left hand and wrist had extended to her "right upper extremity" as a result of the overuse of the right arm to compensate for the injury to the left arm. Id. at 875.
In Ruggs, the trial court also apparently found that the worker experienced constant pain in her left wrist and hand, pain that was unrelated to their use, or overuse. This constant pain was moderate to moderately severe and had caused the worker to become withdrawn and irritable.
In Stone Webster Construction, Inc. v. Lanier,914 So.2d 869, this court overruled Ruggs "[t]o the extent Ruggs conflict[ed] with our holding in [Stone Webster]." 914 So.2d at 877. The reason there was a conflict between our holding in Ruggs and our holding in Stone Webster, and the only reason we concluded it was necessary to overrule Ruggs to the extent we did, was because our analysis in Ruggs had focused on the fact that the worker's pain had spread to another part of her body when, in point of fact, that other part of her body was itself a scheduled member. As we explained in Stone Webster:
 "In Ruggs, we concluded that `the trial court did not err in treating [the employee's] left hand and wrist injury as an injury to the body as a whole.' 891 So.2d at 875. Arguably, Ruggs
can be distinguished on its facts from the present case. The trial court in Ruggs could have, and evidently did, believe the employee's testimony that she `experiences swelling and constant pain in her left wrist and hand, which she rates at a 4 to 6 on a scale of 10. . . . She testified that she elevates and massages her arm approximately three to four hours per day in an attempt to relieve the pain and swelling. She further testified that she uses an electrical-stimulation unit on her arm approximately two and one-half hours per day. . . . She further stated that the constant pain has caused her to become withdrawn and irritable.' Ruggs, 891 So.2d at 873. The trial court found that `[the employee] "experiences constant pain on a moderate to moderately severe level."' Ruggs, 891 So.2d at 873. In Ex parte Drummond Co., the holding necessary for the case before the court was that the scheduled allowance for a lost member is not exclusive `"`if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency.'"' *Page 1146 
837 So.2d at 833 (quoting Bell v. Driskill,282 Ala. 640, 645, 213 So.2d 806, 810 (1968)). This holding was premised upon the Supreme Court's renewed `commitment to the policy that underlay the Bell test,' 837 So.2d at 834, which in its entirety read as follows:
 "'"[I]f the effect of [an] injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the [Workers'] Compensation Law to the amount allowed under the schedule for injury to the one member."'
 "Ex parte Drummond Co., 837 So.2d at 833
(quoting Bell, 282 Ala. at 646, 213 So.2d at 811).
 "Despite this potential distinction, our opinion in Ruggs did not focus on the employee's pain or consider the severity and constancy of that pain as `an abnormal and unusual incapacity' associated with the injury to the employee's left upper extremity. Instead, we concluded that the employee `presented substantial evidence indicating that the effect of the injury to her left hand and wrist extended to her right upper extremity because of the resulting overuse of her right upper extremity' and that the employee was thereby `hinder[ed] [in] her ability to use her right upper extremity.' Ruggs, 891 So.2d at 875. It was on this ground that we held that the trial court did not err in treating the employee's left upper extremity injury as an injury to the body as a whole. Ruggs, 891 So.2d at 875."
Stone Webster Constr., Inc. v. Lanier,914 So.2d at 877. We then went on to explain that Ruggs must be overruled to the extent it stood for the proposition that a court is not bound by the scheduled compensation in § 25-5-57(a)(3) when the effect of an injury to one scheduled member extends to another scheduled member. Stone Webster Constr., Inc., 914 So.2d at 878-79.
Unlike Ruggs, and in contradistinction to Ex parteDrummond and Stone Webster insofar as the facts presented, but consistent with the holdings in both Exparte Drummond and Stone Webster, we are required to and do "focus on the employee's pain [and] consider the severity and constancy of that pain" in the present case. Given the deference that we, as an appellate court are required to give the factual findings of the trial court based on evidence received ore tenus, we must affirm the trial court's judgment that the worker is unable to return to her employment with Masterbrand and that she experiences constant pain of such severity that she is precluded from engaging in other gainful employment.
AFFIRMED.
CRAWLEY, P.J., concurs.
THOMPSON, PITTMAN, and BRYAN, JJ., concur in the result, without writing.
[1] Pronator syndrome is a condition in which the pronator muscle of the forearm swells and tightens from overuse and impinges and presses on the median nerve in the forearm.
[2] The same was true of the pain in the cases overruled in footnote 5 and its accompanying text in Ex parteDrummond. 837 So.2d at 834. Those cases all involved pain associated with the use or overuse of a scheduled member that apparently could have been avoided by the worker's nonuse of the member. The Ex parte Drummond Court overruled those cases only "insofar as they expanded the Bell test."Id. at 835.
[3] By way of example, a worker could experience ongoing pain from an injured member that is so continuous and severe, even when the worker refrains from the use of that member, as to materially adversely affect the worker's ability to use his mind or to concentrate to the degree necessary to accurately or safely perform various tasks. In a real sense, the effect of such pain could properly be considered as "extend[ing] to other parts of the body and interfer[ing] with their efficiency."
[4] "156 A.L.R. 1344 stated, at the time Bell was decided:
 "`"The rule, however, is well established that where an employee has received a specific injury which spreads to other parts of the body and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, the employee is not limited to a recovery of the special allowance provided for in case of injury to a specific member or members, but may recover under the provisions of the act for compensation in case of disability."'
 "Bell, 282 Ala. at 645, 213 So.2d at 811."
Ex parte Drummond Co., 837 So.2d at 833-34 (emphasis added).